KAYSER ET AL., APPELLEES, *v.* THE CLEVELAND CLINIC
FOUNDATION, APPELLANT, ET AL.

(No. 29079—Decided July 3, 1969.)

*Mr. Robert Bednarczuk* and *Mr. Richard F. Patton,*
for appellees.
*Messrs. Arter & Hadden* and *Mr. Smith Warder,* for
appellant.

CORRIGAN, J. Judgments in favor of plaintiffs and
**against** defendant The Cleveland Clinic Foundation, en-

tered upon jury verdicts returned in the Common Pleas Court of Cuyahoga County, are the subjects of this appeal on questions of law before us.

On June 13, 1962, plaintiff Daniel Kayser, 18 years old, sustained an injury to his spine as a result of an automobile accident. He was taken to a hospital in Willard, Ohio, where the attending physician, on examination, found him to be paralyzed in his lower extremities with partial paralysis of his upper extremities. This physician then accompanied the injured plaintiff in an ambulance to Cleveland Clinic Hospital. A preoperative diagnosis there indicated traumatic paraplegia. Lumbar puncture indicated a complete block. In X-rays taken of the cervical spine no dislocation or subluxation was identified. A cervical laminectomy was performed, which disclosed that the spinous process of C-6 was fractured at its distal end; that there was a fracture of the lamina of C-5 bilaterally and of C-4 on the right; that the lamina on the right at C-5 was driven anteriorly and severely compressing the spinal cord; that the sharp edge of the lamina had penetrated the dura to a slight degree and this was elevated and removed; and that the dura was opened and the cord inspected and "the cord actually looked in good condition." The post-operative diagnosis by the neurosurgeon was traumatic paraplegia, secondary to fracture of lamina of C-4 and C-5 with cord compression.

Following surgery, plaintiff Daniel Kayser, still paralyzed, was placed in a rotating "Stryker" bed. On June 16, 1962, as the bed was being turned by a nurse, plaintiff Daniel Kayser was negligently permitted to fall out of it. This lawsuit arises from that fall. The amended petition alleges in connection with the fall "* * * that defendant, Mrs. Ann R. Phoenix and plaintiff, Daniel L. Kayser crashed to the floor."

The bill of exceptions definitively covers the actual fall in the testimony of plaintiff, Daniel Kayser, nurse Ann Phoenix and Thomas O'Mara, a patient in the adjoining bed as follows:

Daniel Kayser (direct examination):

"'* * *, and I remember being on the bed itself, and I remember being turned, starting to turn, and I remember as I was going up gradually to, I'd say a—

"'* * *

"She got—as I said, she started up, and she got to what I'd say was a ninety-degree angle, and then everything happened so fast; within a split second I was on the floor, and I remember I had terrible severe pains in my neck, and I was lying there.

"The first thing I noticed that I remember is seeing the bed where it had fallen apart in a 'V' shape, where the whole front had just fallen away from me, and I remember being on the floor."

(Redirect examination):

"Q. Where was your head in relationship to the floor? A. Well, it wasn't on the floor.

"Q. What was it on? A. I don't know. I guess—well, I just didn't give it a thought what it was on."

Ann Phoenix, on cross-examination as part of plaintiff's case in chief, testified as follows:

"A. * * * Immediately when I noticed that something had went wrong with the bed,—I didn't know what,—I called for help.

"Mr. Kayser's shoulders was just little off.

"As you can see, this bed is a narrow bed. His shoulders was just a little off here. I called for help.

"I put this hand under Mr. Kayser's head, pressed my body this way to hold him in bed, stretched my arms here to hold his paralyzed neck in bed, to keep him in bed, but his legs fell this way, came out. I couldn't keep the bed moving as I was trying to hold him in bed. Mr. Kayser came out this way, with my hand under his head like so, with this arm under his shoulder, his body against me like this.

"Ordinarily, you could ease a patient to the floor like so, but I couldn't ease Mr. Kayser like so because he was very heavy and in doing this, I came down like this; my head struck the bedside stand. I fell over, holding Mr. Kayser's head.

"I thought of keeping his body straight at all times, which I thought I did.

"This is all I can remember.

"I do remember Mr. Kayser's head on the floor. I was concerned about his head and I kept asking him if he was all right.

"* * *

"Q. In other words, he didn't fall out while the bed was being turned? He fell out after you got it flat like this? A. Yes.

"Q. He was lying there in this position when he came out? A. Mr. Kayser did not fall out of the bed at no time.

"Q. I see. In other words, he didn't get to the floor? A. Mr. Kayser got to the floor, but with my help, with me, with my arms, with my hand holding his head with this arm under his shoulders with me going down to the floor with him, but Mr. Kayser at no time did not drop to the floor, ever.

"Q. How many people helped you put him on the floor? A. No one.

"* * *

"Q. I want to hear how you would say it to him. A. I told Dr. Tank that in the process of bringing the bed back over, I don't know what happened to the bed. Mr. Kayser had a small drop from here and landed on the bed. His shoulders was just a little off the side of the bed.

"I used my hand to try to get his shoulders back into bed. I used my body against his body to try to hold his body in bed. His legs fell out.

"I had him like this and I eased him to the floor, and in the process of doing so, I struck my head on the side of the bed.

"* * *."

The pertinent testimony of Thomas O'Mara, a patient in the same room with Daniel Kayser, concerning the fall, which was by deposition, as part of such plaintiff's case in chief, was as follows:

"* * *.

"Q. Did you see an incident occur when he came out

of the bed there? A. Well I was lying facing away from him, toward the windows, and I heard him yell, so I turned over, because I thought I could go the phone to call the nurse, and I wanted to call her if I could help him.

"But just as I was turning over, I saw him falling out of bed. The nurse was already there, and she tried to catch him, but the bed was coming down on top of her, so she just put out her arms, and he fell on top of her, and she caught his head so it wouldn't hit the floor.

"* * *."

Plaintiff Daniel L. Kayser further alleges in his amended petition:

"6. Plaintiff Daniel L. Kayser, says he experienced severe pain in said fall from the aforementioned Stryker bed on June 16 1962; that the spinal cord was caused to be inverted outward in the area of the said laminectomy that was performed on June 13, 1962 by defendant Dr. Donald F. Dohn; that because of the aforementioned fall his chances for recovery were made hopeless and permanent damage resulted therefrom; that his condition became that of traumatic quadriplegia because of the defendants' negligence.

"7. Plainitff, Daniel L. Kayser, says that the aforementioned treatment accorded him by the said defendants, Dr. Donald F. Dohn, Cleveland Clinic Foundation and Mrs. Ann R. Phoenix, P. N. from the time he entered the defendant Clinic on June 13, 1962 through June 16, 1962 until after the fall was unusual; that the aforementioned defendants had exclusive control of all of the aforementioned facilities; that the plaintiff being temporarily paralyzed to the degree of helplessness was without any control; that the said plaintiff was not himself negligent in any manner; that said plaintiff sustained severe and permanent injuries.

"8. Solely by reason of the premises, plaintiff says that he received severe permanent injuries to the entire spinal column, permanent paralysis of his entire body below the neck area and other injuries presently undiagnosed, the allegations of which plaintiff prays leave to complain

when ascertained that he does, is and will permanently suffer severe and excruciating pain."

Leighton W. Kayser, father of Daniel Kayser, sues for medical expenses and loss of services.

Answer of defendant The Cleveland Clinic Foundation, in part, denies that plaintiff Daniel L. Kayser sustained injury of any kind, nature or description at the hands of such defendant and denies that plaintiff Leighton W. Kayser sustained any damage at the hands of this defendant.

Succinctly then, plaintiff Daniel Kayser maintains that his present paralyzed condition is due to the fall from the bed and not from the automobile accident. It is defendant hospital's position that plaintiff Daniel Kayser's para--lyzed condition was caused by the automobile accident and it denies that such plaintiff sustained injury of any kind or description at the hands of defendant hospital. The jury awarded $200,000 to Daniel Kayser, and $12,500 to his father, Leighton Kayser.

The Cleveland Clinic Foundation assigns seven claims of error as follows:

1. The trial court erred in failing to direct a verdict in favor of defendant appellant.

2. The verdicts and judgments are contrary to law.

3. The verdicts and judgments are against the weight of the evidence as to each plaintiff, both as to proximate cause and to damages.

4. The verdicts are grossly excessive in amount so as to be incurable by remittitur.

5. The trial court erred in admitting certain evidence.

6. There is a complete failure of proof that any injury was caused to plaintiff Daniel L. Kayser by the incident of which he complains.

7. Other errors upon the face of the record to the manifest prejudice of defendant appellant.

As outlined above, the assignments of error do not urge that Cleveland Clinic was not negligent. Rather, 28 pages of appellant clinic's brief do not take up the numerical assignments of error but argue its appeal on chiefly one **broad claim, namely:**

"There was no competent evidence that the fall caused any injury whatever to plaintiff."

The other two brief claims are set forth as follows in the brief:

"The judgment is against the weight of the evidence.

"All that has been said foregoing applies to the proposition that the judgment is against the weight of the evidence. The quality of the evidence need not be belabored."

And, "There was error in admitting evidence.

"As already pointed out the court erred in failing to strike Siegenthaler's testimony. Again, with a correct ruling, judgment follows."

Under the provisions of Section 2505.21, Revised Code, we must pass upon each assignment of error, and if any are not argued we may treat these as abandoned.

As to the first assignment of error, the failure to direct a verdict for Cleveland Clinic, we find no merit. On the motion of counsel for Cleveland Clinic, after both sides had rested, the trial court directed a verdict against it on the issue of negligence and in the general instructions charged the jury that Cleveland Clinic was negligent as a matter of law as to plaintiff Daniel Kayser falling from the Stryker bed on June 16, 1962.

Then we come to the question of proximate cause, and at this point we also consider assignment of error number 6, that there was complete failure of proof that any injury was caused to plaintiff Daniel L. Kayser by the incident of which he complains. This claim is not sustained by the record. There is some testimony of a subluxation at C-1 level demonstrated by X-ray picture taken after the fall from the Stryker bed and testified to by Dr. Siegenthaler, Daniel Kayser's witness. This latter witness also testified to observing such plaintiff experiencing pain in the region of the neck which was involved in the subluxation which he had diagnosed on July 19, 1962, after the fall from the bed. Plaintiff Daniel Kayser himself also testified to experiencing "that terrific pain in the neck" after the fall. So, there is evidence of an injury to the neck in the fall.

True, on behalf of the defendant hospital, Dr. Thomas Tank, a neurosurgeon, testified that he attended the plaintiff Daniel Kayser immediately after the fall fro the bed and found no new injury. Also, Dr. Dohn testified for defendant hospital that he examined Daniel Kayser after the fall and that, in his opinion, Daniel Kayser had not injured himself in any way as a result thereof. An expert witness for defendant hospital, Dr. Richard C. Schneider, a neurosurgeon, viewed the X-ray exhibits 7-H, 7-C and 7-G, from which such plaintiff's chiropractic doctor found a subluxation at C-1, and in his opinion he found no evidence of such a dislocation in the atlanto-occipital area. The triers of the facts passed on this conflicting testimony, as is their function; and assignments of error numbers 1 and 6 are overruled.

We consider now claim of error number 3, that the verdicts and judgments are against the weight of the evidence as to each plaintiff, both as to proximate cause and to damages. We have indicated above that the diagnosis after the automobile accident and subsequent surgery on the spine was "traumatic paraplegia, secondary to fracture of lamina of C-4 and C-5 with cord compression." There is not one syllable of medical testimony that Daniel Kayser recovered from this condition, or was recovering, or would have recovered from this condition, at the time of his fall from the Stryker bed. However, there is some evidence of improvement in such plaintiff from the time he left the Cleveland Clinic on July 19, 1962, to the time of trial in October 1967, in the testimony of Dr. Donald F. Dohn at the trial, as follows:

"* * *.

"Q. Doctor, there has been much testimony here about a transection of the cord. Did Danny have any type of transection of the cord? A. He had what we called physiologic transection of the cord.

"Q. And in your term of reference, Doctor, what does this mean? A. This means that at this level—in this case at the C-5 level—all function that normally passes by way of this level has been interrupted, so that impulses that

normally go down through this segment to the rest of the body cannot pass through,—impulses, nerve impulses I am speaking about that normally pass up through this segment of the cord from the rest of the body can no longer pass through so all function is arrested.

"Q. Doctor, when the patient sustains complete motor and sensory paralysis, what is the prognosis? A. The prognosis is determined in large part by two things. First of all, if one can see the spinal cord at surgery and it's completely anatomically transected so it's divided in half, the prognosis for recovery, in my experience and from the literature, is nil. There is no way to my knowledge that this person can recover function.

"Anything short of anatomical transection, one can only prognosticate on a time interval, because a normal appearing cord does not mean that the patient will recover. On the other hand, a badly bruised cord does not mean that he may not recover.

"Now, as a rule of thumb, it has become known in the neurosurgical world, and from the literature, and from our experience, that usually if a patient who presents himself with complete paralysis below the level where the injury occurred, both motor and sensory, and this does not recover after twenty four hours have elapsed that the prognosis for complete or good recovery is very poor.

"Q. Doctor, now I noticed you said for complete or good recovery. Does your statement as you just made it rule out all recovery? A. No, not at all.

"Q. Does this vary from patient to patient? A. Yes.
"* * *

"Q. Doctor, you saw Danny in the courtroom, of course? A. Yes.

"Q. Was he better or worse than when you last saw him at the Clinic? A. He was better.

"Q. Medically, how would you account for this? A. Well, this is what we know happens in many spinal injuries where there has been paralysis.

"As time goes on, nerve function is restored. Now this occurs because the segment of the cord that has been dam-

aged reconstitutes itself and nerve impulses can again get down to the parts and back up to the brain, but recovery may not begin for months.

"Q. Doctor, one last question.

"In your treatment of Danny and from the chart and from your knowledge of his case, have you found any evidence whatsoever that Danny sustained any permanent injury in his fall from the bed? A. No, sir."

This testimony is generally supported by the testimony of Dr. Tank and Dr. Schneider. Further, the record does not reflect any testimony that such plaintiff's spinal cord was in good condition at the time of surgery. The record shows that Dr. Dohn said, "the cord actually looked in good condition." However, the medical testimony is clear in the record that the cord can look perfectly normal to the neurosurgeon's inspection but that the function in that cord can be completeley lost permanently; that the normally appearing cord does not mean a normally functioning cord and that they are divorced properties; and that one has no idea how severe the damage is within the center of the cord merely by the way it looks on its outer aspect.

Plaintiff Daniel Kayser's evidence on proximate cause is contained in the direct and cross-examination of Dr. Ralph Siegenthaler, a chiropractor, as follows:

(Direct examination):

"Q. Doctor, I am going to ask you what is known as a hypothetical question. I am going to ask you to put out of your mind everything that you considered in the Danny Kayser case, and only consider those facts which are contained in this hypothetical question.

"First of all, consider this hypothetical man, age 18 years of age, on June 13, 1962, enjoying good health, was involved in an automobile accident on that afternoon, and at that time he was first taken for emergency treatment to the Willard Hospital, and thereafter transferred to the Cleveland Clinic Hospital on the evening of June 13, 1962.

"You are to further consider that this hypothetical boy had surgery on the early morning of June 14, 1962, for a cervical laminectomy at C-4, 5 and 6, which involved

a fracture of the lamina of C-5, and slightly penetrating the dura of the spinal cord.

"That the surgeon who performed the surgery found the spinal cord at that time was in good condition, and furthermore that the surgeon and the hospital radiologist at that time further found that there was no evidence of dislocation or subluxation from the X-rays at the time of the surgery or the cervical laminectomy at C-4, 5 and 6.

"Thereafter this hypothetical boy was dropped from his hospital bed on June 16, 1962, at or about the hour of 10:00 a. m., and he thereafter had pain in his cervical region up to and including the day he was first examined, X-rayed, and treated at the Hayes Clinic by two chiropractors.

"At the time of the fall from the hospital bed, the nurse attending the hypothetical man tried to stop the hypothetical man's fall from the bed by holding his head in her hands behind his head, and then she tried to keep this man from falling by using her body against his lower extremities.

"But his falling lower extremities caused the nurse and the hypothetical man to fall to the floor with the nurse supporting the hypothetical man's head at all times, and at no time did the hypothetical man's head strike the floor, although his shoulders and his extremities below the shoulders were on the floor.

"Thereafter, on July 19, 1962, this hypothetical man went to the Hayes Clinic and was examined by two licensed chiropractors, X-rayed, and a history was obtained, and from the X-rays, it was found that he had sustained a subluxation of the C-1 vertebra.

"Now, assuming all of these facts to be true, Doctor, do you have an opinion based upon reasonable chiropractic certainty as to whether or not the subluxation of C-1 diagnosed by the chiropractors on July 19, 1962, was directly and proximately related to the hypothetical man's fall from the hospital bed on June 16, 1962? Do you have an opinion on that, Doctor? Answer yes or no. A. Yes.

"Q. What is that opinion, Doctor? A. My opinion is that it was the direct result.

"Q. And what are your reasons for that, Doctor?

"The Court: Direct result of what?

"A. That his injuries were the direct result of the fall."

It should be noted here that there was no objection by defendant hospital to the hypothetical question, even though it assumed that the spinal cord was in good condition at the time of surgery. It is further to be noted that the question which was answered covered the direct relationship of the subluxation testified to and the fall from the bed. The trial judge misstated the question asked, and the answer to his question necessarily referred back to the injuries posited in the hypothetical query, namely, the subluxation of C-1 diagnosed by the chiropractors.

Later, in the direct examination of Dr. Siegenthaler, we find this further opinion testimony:

"Q. Doctor, do you have an opinion based upon reasonable chiropractic certainty as to whether or not Danny sustained permanent injuries as a direct and proximate result of his fall from the hospital bed on the 16th of June, 1962, which resulted in his sustaining a subluxation of the C-1 vertabra.

"* * *

"And I would also like to include a compression of the spinal cord as you have described it in your original or earlier testimony?

"* * *

"Objection overruled.

"A. Yes.

"Q. What is your opinion, Doctor? A. Well, it's just that I don't ever like to think of a condition like that being permanent. I know it's been a long time, but I mean he's come a long way and there is still plenty, I hope, with himself and myself, I know that he will go a lot further than he has so far. That was the only point I wanted to get across."

It is noted that the "permanent injuries," referred to in the question, are not identified or described.

This is the totality of the testimony on the causal relationship of the fall from the bed and the condition of traumatic quadriplegia up to the cross-examination of Dr.

Siegenthaler. It must be remembered that this condition of traumatic paraplegia was the pre-operative diagnosis by the neurosurgeon, Dr. Dohn, with the cause thereof, as "secondary to fracture of lamina of C-4 and C-5 with cord compression."

Then the record reflects the following question and answer sequence in the cross-examination of Dr. Siegenthaler by counsel for the Cleveland Clinic:

"* * *.

"Q. You also said yesterday that you found pressure on the spinal cord as a result of this subluxation. Did I follow you? A. Probable pressure against the spinal cord, sir.

"Q. How much pressure did you find, Doctor? A. There is no way to measure the amount of pressure, sir, except by the symptoms of the patient.

"Q. From the symptoms of the patient, how much did you find? A. There was enough to render him in the physical state that he was at when he came into the office.

"Q. Now, I want to be perfectly clear on this.

"It is your testimony that his physical condition when you first saw him was entirely and wholly the result of this subluxation of the skull on C-1 or C-1 on the skull. Is this your testimony? A. This is my testimony.

"* * *."

Thus the first evidence as to the fall from the bed proximately causing the condition of quadriplegia.

On further cross-examination, we find the following:

"* * *

"Q. Doctor, with a compression of the cord at the level that you have described, what signs would you expect in the patient? A. Headache, rigidity of the muscles right along the base of the skull and through the upper portion right in here, dizziness, nausea, vomiting.

"Q. Anything else, Doctor? How about the extremities? A. Paralysis.

"Q. Total or partial? That would depend upon the amount of the pressure, would it not? A. Yes, sir. In a sense—May I or—

"Q. Go ahead. A. In a sense, I mean, depending on

the amount of pressure, it would also depend on actually what was compressed at that specific point, what nerve fibers. * * *."

And, later in the cross-examination, the following appears:

"* * *. Doctor, assume, if you please, that Danny Kayser was in an automobile accident on the 13th day of July, 1962; that he was brought to the Cleveland Clinic later on the evening, in the evening approximately five to six hours after his automobile accident; that by this time he was quadriplegic.

"Assume further that a laminectomy was done at C-4, 5 and 6 level and the cord was found to be compressed at the C-5 level. The pressure was removed and the cord appeared to be in good condition.

"Assume further that Danny remained quadriplegic until the 16th, when he had an incident wherein he came off the bed and onto the floor.

"Assume further, if you please, that he was immediately gone over neurologically, and his condition was found to be precisely the same as it was before he fell.

"There were no neurological differences.

"On these assumptions, Doctor, wouldn't it be fair to say that Danny's paralysis came from the automobile accident and not from the fall?

"* * *.

"A. No, I don't think it is a direct result of the automobile accident.

"* * *.

"Q. And on the basis of this, you have told this jury that in your opinion, his entire condition is due to the fall rather than the automobile accident. Is this fair? A. Yes, sir.

"* * *.

"Q. If I follow your answer, there is a corollary to your opinion, and that is that but for the fall from the bed, Dr. Dohn's treatment would have been completely successful and Danny would have regained full and complete bodily function? A. Sir, that is what I achieved from

the question you asked me before, the long question, that the compression was removed and the cord was found in apparent good shape.

"Q. And if it is in apparent good shape, that is the end of it, I mean, function will return? A. As far as the wording, the way it was worded in such a way that you would take for granted that the cord was in good shape.

"* * *.

"Q. You have testified that in your opinion, his present condition is solely due to the fall from the bed. You told us that, didn't you? A. Yes, sir.

"Q. Doesn't it follow that if it is solely due to the fall from the bed, had the fall not occurred, Danny would have recovered completely? A. I would have to assume that, because I never would have seen him if he would have recovered completely. I mean I never would have met him."

To recapitulate in connection with the proof of proximate cause, the record before us does not support the plaintiff Daniel Kayser's allegations set forth in paragraph 6 of his amended petition to the effect "that because of the aforementioned fall his chances for recovery were made hopeless and permanent damage resulted therefrom; that his condition became that of traumatic quadriplegia because of defendant's negligence." Absent any expert medical testimony that Daniel L. Kayser was recovering and would completely recover from the quadriplegia resulting from the automobile accident, we are faced with a complete failure of proof that because of the fall from the Stryker bed his chances for recovery were made hopeless and permanent damage resulted therefrom; and absent any expert medical testimony that Daniel L. Kayser would have recovered from the quadriplegic condition diagnosed as a result of the automobile accident, then his condition could not have become that of traumatic quadriplegia because of defendants' negligence in the fall from the Stryker bed, simply because such a condition of paralysis cannot be superimposed upon an existing paralytic condition of the same nature. The jury cannot be permitted to speculate upon the relative amount of injury, if any, due

to the automobile accident and then due to the fall from the Stryker bed in connection with plaintiff Daniel Kayser's quadriplegic condition. There must be some evidence to distinguish the injury, if any, due to each of the two causes.

Likewise, the record before us does not support the allegation in paragraph 7 of plaintiff Daniel L. Kayser's amended petition, that plaintiff "being temporarily paralyzed * * *." Paragraph 8 of such plaintiff's amended petition is not supported by the record, absent any expert medical testimony on recovery from the original condition of traumatic quadriplegia established by the record as being proximately caused by the automobile accident.

Accordingly, it is our holding that the verdicts and judgments are against the weight of the evidence as to each plaintiff, both as to proximate cause that the negligence of defendant Cleveland Clinic, in connection with the fall of plaintiff Daniel L. Kayser from the Stryker bed, resulted in the latter's condition of traumatic quadriplegia, and as to damages therefor, and likewise as to the claim of plaintiff Leighton W. Kayser for medical expenses and loss of services.

The other assignments of error are overruled.

As pointed out above in this opinion, there is some evidence in the record that plaintiff Daniel L. Kayser suffered an injury at the C-1 atlas level of his spine in the fall from the Stryker bed.

For the reasons stated, the judgments of the court below as to each plaintiff are reversed and the cause is remanded to the Court of Common Pleas for further proceedings according to law.

*Judgments reversed.*

WASSERMAN, C. J., and ARTL, J., concur.